First case on our call this morning is agenda number 8, case number 106-219, People of the State of Illinois v. Troy A. Davidson. Counsel may proceed. Thank you very much, Your Honor, and may it please the Court. My name is Assistant Attorney General Michael Blankenheim, and I represent the people in this case. The appellate court in this case significantly narrowed the reach of the possession of a deadly substance statute by adopting a restrictive and atextual interpretation of the statutory language poisonous gas, holding that that term refers only to gases that are designed to kill or injure and thus does not include the substance anhydrous ammonia. Because that interpretation cannot be squared with the statute's plain, unambiguous language, this Court should reverse. The possession of a deadly substance statute prohibits, as is relevant in this case, an individual from possessing any poisonous gas with the intent that the gas be used to commit a felony. Here the defendant was charged with possessing anhydrous ammonia with the intent to commit the felony offense of methamphetamine manufacturing. The statute does not define the term poisonous gas, so it's permissible for this Court to look to the dictionary to define that term, as the dictionary reflects the ordinary and popularly understood meaning of terms. But when does the anhydrous ammonia become poisonous? The testimony at trial, Your Honor, showed that exposure to anhydrous ammonia at just about any level will be harmful or fatal to humans. When this arrest was made, was it a tanker? Yes, he possessed a... What precautions were taken by the officer, masks, or any kind of outfits that would protect him from poisonous substances? The officers were not wearing protective gear, but they testified that they made a knowing and informed decision that they could inspect the tank briefly to determine what the tank contained while remaining safe around the anhydrous ammonia. Was there testimony, expert testimony that established that it was poisonous in the state in which it was found? There was testimony that anhydrous ammonia is poisonous at just about any level, but there was no specific testimony regarding the connection between the amount in this case and the toxic or poisonous nature of the gas. Here the defendant possessed an approximately 30-pound propane tank, and the responding officers testified that the tank was about three-quarters full, but not entirely full. And again, the term poisonous gas is not defined in the statute, so it's permissible for the court to look to the dictionary as that reflects the term's ordinary and popularly understood meaning. Mr. Blankenshine, didn't the court use the word or put the word inherently into the statute? Is that word in the statute? No, Your Honor. The term inherently deadly is not in the statute, and that is a restriction that the appellate court inserted into the plain language of the statute in violation of well-settled rules of statutory interpretation. Since the ordinary meaning of the term poison is something that is harmful or fatal to humans in suitable quantity when it's absorbed by or comes into contact with that organism. And so this court should afford that the term poisonous gas is plain in ordinary meaning and hold that the term refers to a gas that in suitable quantities is harmful or fatal to humans. And it's important to note that the term's ordinary meaning draws the meaning is drawn from the harmful or adverse effects that the gas has when it comes into contact with a human or is absorbed by a human, rather than the purpose for which the gas is designed. And that is the meaning that the appellate court adopted in this case. And the evidence in this case, to the extent that the defendant may be raising a sufficiency of the evidence argument that even assuming that the term poisonous gas refers to gases that are not strictly designed to kill or injure, the evidence was more than sufficient to allow a rational finder of fact to determine that anhydrous ammonia was a poisonous gas. There was testimony from an Illinois State trooper who was an expert in the transportation of hazardous materials that exposure to anhydrous ammonia will cause an individual's throat to shut down, the person won't be able to breathe, and it's likely that he or she will collapse and won't be able to escape the scene. Several sheriff's deputies testified that anhydrous ammonia is particularly unsafe, as in this case, when it's stored in a container not approved for that purpose. Here the defendant had a propane tank with an altered valve, and there was testimony by the officers that when anhydrous ammonia comes into contact with certain metals, such as brass, it can corrode that metal, and the altered valve in this case was not a suitable valve to keep the gas contained in the tank. There was also testimony by the Clark County Sheriff Parsley that inhalation of the gas at a sufficient amount is likely to cause death. What is a sufficient amount? Excuse me, I believe he said that an excessive amount is likely to cause. What is an excessive amount? He did not elaborate on that testimony, but I think Your Honor can consider Trooper Cruz's testimony that exposure to anhydrous ammonia is likely to cause great bodily harm or death to an individual who is exposed to the anhydrous ammonia at that amount. And to put that. Exposure? I believe he was using the term. In terms of distance consumption or touching the skin? I believe he was referring to inhalation and coming into contact with the skin. There is additional evidence provided from the Code of Federal Regulations that classifies anhydrous ammonia as a gas poisonous by inhalation when that is shipped in international shipments. The Code of Federal Regulations defines a gas poisonous by inhalation in terms of the toxic effects that the gas can have on humans rather than the purpose for which the gas was designed. Would your interpretation broaden the statute? It would not, Your Honor. Before the statute, it's plain and unambiguous language. Although the statute does admit of a broad application, that's the language that the General Assembly chose in passing the statute. The statute uses the term any, which this Court has recognized on multiple occasions, signals the General Assembly's intent to sweep broadly. And that's particularly appropriate here to include any poisonous gas since the ultimate objective of the statute is not mere possession of the poisonous substance, but possession of that substance with the intent that it be used to commit a felony. And the testimony in this case shows that anhydrous ammonia is useful in the commission of a felony, even though it's not specifically designed for an illicit purpose. Is there any significance to the fact that the legislature has made specific provisions for penalties associated with anhydrous ammonia in connection with the production of methamphetamine? No, Your Honor. Primarily because the statute is plain and unambiguous. There's no need to consider other tools of statutory interpretation. But even looking to the methamphetamine law, the passage of that statute in 2005 cannot be construed as repealing by negative implication anhydrous ammonia from the deadly substances law. I think most importantly, the methamphetamine law reaches cases that are not reached by the possession of the deadly substances law, and the deadly substances law reaches cases that are not reached by the methamphetamine law. Section 25 of the methamphetamine statute prohibits possession, procurement, storage, delivery, or transportation of anhydrous ammonia with the intent to manufacture methamphetamine. But the deadly substances law reaches the additional action of manufacturing the poisonous substance, in this case anhydrous ammonia. The methamphetamine law is also limited to prohibiting someone from possessing, procuring, storing, and so forth with the intent to manufacture methamphetamine. But the possession of the deadly substances law is far broader, and it prohibits the possession of a deadly substance with the intent to commit any felony. In people versus quails, isn't that perhaps that's what the appellate court followed or indicated they were following in injecting inherently deadly into the wording? But didn't the appellate court note that the poisonous gas is intended to cover situations such as sarin and the like? Yes, the appellate court noted that that comment was made during the discussions of Senate Bill 509 in the House Judiciary Committee. So in discussing that bill, the speaker indicated that perhaps one of the motivations or one of the substances to be outlawed by the deadly substances law was sarin gas or mustard gas. But in enacting the statute, the General Assembly used a broader term, poisonous gas, rather than a narrower term such as poison gas, which the appellate court failed to recognize in this case, refers only to gases that are designed to kill or injure, such as sarin gas and mustard gas. It's important to note that the comments Your Honor referred to in the House Judiciary Committee and also in the Senate referred not just to the possession of a deadly substances law. It referred to the Senate Bill 509, which established that offense, but also established a series of other offenses and made changes to certain statutes. One of those changes was an amendment to the disorderly conduct statute. The General Assembly amended that statute to prohibit the transmission of false alarms respecting the existence of a canister containing poison gas. And so that shows that the General Assembly was aware of a difference between the broader term, poisonous gas, which was used with respect to the statute at issue in this case, and the narrower term, poison gas, that refers only to gases that are designed to kill or injure. And I'd like to turn back to the appellate court's analysis in this case. They determined that the statute was ambiguous because it could reasonably be construed as referring not only to gases that are harmful or fatal in suitable quantities, but also to poisonous gases that are designed to kill or injure. And that was erroneous for three reasons. As the court's aware, a statute is ambiguous only if it can be reasonably interpreted in two different ways. Here it was unreasonable for the appellate court to adopt the second definition,  because on page nine of our opening brief we set forth the definition of poison gas, and that term is defined as one subset of the broader term, poisonous gas. So it's unreasonable to construe the broad language any poisonous gas is referring to only certain kinds of poisonous gases, those gases that are designed to kill or injure. And second, closely related to that, in searching for that second definition, the appellate court considered the definition of a term that does not appear in the statute, which is in conflict with this court's precedent, instructing courts not to attempt to read statutes other than in the way they're written. Even if this court were to find that the statutory language poisonous gas is ambiguous, a number of reasons counsel in favor of construing that term in favor of reaching gases like anhydrous ammonia that are harmful or fatal to humans. And the primary reason I discussed briefly is the use of the narrower term poison gas in the amendments to the disorderly conduct statute. Again, that statute was amended as part of Senate Bill 509, which also established the offense of possession of a deadly substance, and so that shows that the General Assembly was aware of the difference between these two terms and when they wanted to require evidence that a gas was designed to kill or injure, they knew how to do so. And this court's recent decision in People v. Hudson provides that when different language is used in different parts of the statute, presumably different meanings are intended. Second, the Senate Bill 509 amended the heinous battery statute to provide that anyone who commits in committing a battery causes great bodily harm to another by means of a poisonous gas is guilty of a heinous battery statute, of a heinous battery. And that's important here because that shows that when the General Assembly used the term poisonous gas, their concern was with the harms that result from that, from the use of that gas, rather than the illicit purposes for which the gas was designed. And, again, the General Assembly's use of the term any should signal its intent to sweep broadly, and any ambiguity should be resolved in favor of the broader term or the broader definition of gases that are in suitable quantities harmful or fatal to humans. The appellate court in this case also noted that, also adopted the more restrictive interpretation of poisonous gas by noting comments made by Senator Dillard, who was the sponsor of Senate Bill 509, that the Senate Bill as a whole was aimed at terrorism-related offenses. It's important to note that the majorities interpret, even assuming that the appellate court majority was correct in holding that that isolated comment should control the plain meaning of the statute, which is not correct, but even granting that point, the majority's interpretation is inconsistent and in fact undermines the General Assembly's intent in passing the deadly substances law as an anti-terrorism offense. As the dissenting justice noted in this case, anhydrous ammonia is a precursor to ammonium nitrate, which is one of the ingredients used by the persons responsible for the 1995 Murrah City bombing, which was a terrorist act. So by adopting the appellate court's interpretation of poisonous gas, the intent, to the extent that the statute is about anti-terrorism offenses, that intent is undermined since anhydrous ammonia can be valuable to terrorists. If the court does not have any further questions, I'll save the remainder of my comments for rebuttal. Thank you. Counsel, you may proceed. May it please the court. Counselors. I think what we're here for is the key. Counsel, can you begin with your name, please? I'm sorry, Your Honor. I'm Mike Bonneman. I represent Mr. Davison. I'm with OSED. The key here is anhydrous ammonia, a poison gas, for the purpose of the statute labeled deadly substance. I mean, that's what we're here for. I agree that poison gas is not defined in the statute. I agree we should look to Webster's to define it. I believe that the definition that we should use is it designed to kill, injure, or disable, as in chemical warfare. That was the purpose for this statute. And how do we know that? Well, we look at, first, the rule of lenity, which is. Wait a minute. Counsel, we don't even get there unless we determine that there's an ambiguity, right? Correct, sir. And you said, and I believe in your briefs you point out that there are multiple definitions of poisonous gas, and as a result of that, that creates the ambiguity. You like the definition that you just gave, but since there's an ambiguity, we have to look to further statutory construction, right? I agree, Your Honor. Rules of statutory construction. I agree, Your Honor. Well, why do we have to choose between any definitions? Doesn't the statute plainly state that it's a crime to possess any poisonous gas? Well, Your Honor, it's any poisonous gas. It's not any gas. The key is still poisonous. Right, and doesn't that encompass every definition? Would you agree that that encompasses every definition of poisonous gas? I believe it encompasses any definition of poisonous gas, as it's used in the statute with the statutory intent that this statute was for. Yeah, well, that's why I started by saying that if indeed it is not ambiguous, if the wording is not ambiguous, we don't go to other tools of statutory construction. Let me state it differently. The fact that both gases were designed to inflict death and there are gases that in suitable quantities are harmful or fatal to humans, both of those type of gases can be defined as poisonous, can't they? Under Webster's, I would be correct, Your Honor. So that doesn't render a statute ambiguous, does it? It simply means that both such gases fall within the statute's reach of any poisonous gas. Well, I think it does mean it's ambiguous because we're talking about a deadly substance statute. I mean, under Judge Myerscough's theory, chlorine could be poisonous. Gasoline could be poisonous. And if you want to take that to the logical step, if a person's walking down the street with chlorine in their pocket and they want to throw it at a teacher, that's a violation of this statute. Well, I'm just trying. Now you're getting to other. You're saying we can't come up with an absurd result. I'm just focusing on the word any poisonous gas. The statute clearly says any poisonous gas. It does, Your Honor. Which encompasses both of the definitions of Webster. And so I guess my question really comes down to how do we get to other rules of statutory construction if this Court determines that the any portion is not ambiguous? Well, I don't think it's the any is what we should be focusing on, Your Honor. I think it's the poisonous is what we should be focusing on. I mean, they didn't say any gas, any gas that could hurt you. They said any poisonous gas. And they said any poisonous gas under the subject of deadly substance. I mean, you've got to read that all together. You can't just take isolated words out. We're talking about deadly substances here. However, the appellate court had to insert inherently for some reason to reach its conclusion. Well, it's... That's nowhere in the statute, is it? It's not in the statute. But they are trying to figure out what the legislator meant when they passed the statute. But using words that was not in the statute to reach their conclusion poses a problem, doesn't it? Well, they're taking a definition which is designed to kill. And they're using the next logical thing was if it's designed to kill, then it's inherently dangerous. Whereas anhydrous ammonia is designed for farmers to go out and kill insects and stuff to help their crops. That's the purpose of anhydrous ammonia. I mean, it's just ammonia that the water's taken out of it. It's not... The purpose of it is not for terrorist acts, which is what this statute was for. By the legislative history, by what the senators said. You know, back in 99, when they're debating this, that's what they're talking about. We don't have a statute that prevents terrorists from getting sarin gas when we need one. They already had a statute for transporting anhydrous ammonia. It was a class 4 felony. In fact, this guy was charged with it before it got severed out. That was not the issue. The issue is dangerous substances, terrorist activity, poisonous gas, radioactive material, which are the other words in this statute, deadly biological or chemical contaminants. Those are the things we're dealing with under the statute. I mean, what happened was this prosecutor overreached. Now, and I think even further it shows the point, as was touched on earlier, they came up with a mess statute in 2005. It was now made it a class X or a class 1 to transport anhydrous ammonia. And the reason they came up with that is because they didn't have a statute for it. You've got to read this, I believe anyway, you've got to read this all together. And I'm not saying that your argument isn't intellectually honest once we get past the plain reading of the statute. But you indeed have indicated that any poisonous gas would encompass both gases designed to inflict death and gases, and again, it's a death statute, that in suitable quantities are harmful or fatal to humans. I said under Webster's definition that those things are common. Those things are under Webster's. Those are how it's defined in Webster's. I agree with that. I'm saying that this statute does not encompass that. You're saying that the statute wasn't intended to encompass that. My question goes to how do we get around any poisonous gas with both of those gases being encompassed by the word any? Well, I guess, again, I disagree with how you're saying that. I think the issue is poisonous gas, not any gas. I think any is a red herring. I think poisonous is the key. I mean, what your Honor is doing or what your Honor has said is the definitions under Webster's, and I can't say that they aren't in Webster's. They are. But the key is what does poisonous gas mean under this statute? We can't write out a word of the statute, though, can we? Well, we have to define what the legislature meant by it. I think that's why we're here. In effect, didn't the appellate court conclude that it was ambiguous and relied upon quails and the language of quails? Yes, Your Honor. Both appellate courts ruled it was ambiguous, and I believe even the state has agreed it's ambiguous. At least it's not defined. And that's why we're here. Can we go to an appellate court opinion in helping us to understand the poisonous rather than go to legislative intent? Of course. Of course we can, Your Honor. I mean, we're looking at both. We have two appellate courts that both decided that it is ambiguous. And both of these opinions pretty much track each other in how they come to the conclusion that they come to. As far as the dangerousness of ammonia hydrous and hydrous, I would like to point out even in the facts of this case, the trooper testified that this is a Class D out of four possible categories under the Code of Federal Regulations for inhalation hazardous zones. And the facts were that the sheriff took this propane tank of anhydrous ammonia and took it out to a shooting range and shot it. I mean, he didn't think it was all that dangerous. They didn't use all this hazardous material stuff. And then they took the propane tank and put it in their office and left it there. Are these deadly substances? They didn't treat it that way. Again, I think and I understand the court's concern, but if there is an ambiguousness, I think you have to try to figure out what they want. And you look at the other words and the Latin word, and I'm going to try to pronounce it, is that words mean what their fellow words mean in a sentence. And the fellow words in this case are radioactive substances, deadly substances, deadly biological chemical contaminants. That's how you have to look at this thing. How this court rules, obviously, is going to be used down the line. And the prosecutors want to use deadly substances. For my example, or even more ridiculous examples, a guy driving his car. I want a revoked license. He's transporting gasoline with intent to commit a felony because he's got two priors. I mean, is he guilty of this offense? If you're going to make it that broad, he is. That's a class four felony. Now it's a class one. Well, if there are no other questions, that's all I have. Thank you. Counsel, is there any justification in considering, based upon our court opinions, what precautions are taken when police officials encounter this particular gas? I'm sorry, Your Honor. Can you repeat that? I could try. Is there any value in this court considering how this gas is treated by law enforcement officials when they have contact with it during their police activities? Certainly. It's appropriate to do that. And can we properly do that? It would be appropriate for this court to do that to the extent that the defendant has raised a sufficiency of the evidence argument to consider the trial testimony in this case regarding the precautions that were taken when the anhydrous ammonia was removed from the crime scene. I have to disagree with my opposing counsel's characterization of the record. When the sheriff took the propane tank with the anhydrous ammonia to dispose of it, at that time, and this is at page 176 and 177 of the trial record, he was wearing a fireman's coat, rubber gloves, and a gas mask with air filters. And so that shows that anhydrous ammonia is a dangerous substance, and law enforcement is aware of that. And when they're dealing with it, they're going to be taking those precautions. Turning back to opposing counsel's primary argument, in this case, there's only one definition of the term poisonous gas, and that is a gas that is in suitable quantities harmful or fatal to humans. Could gasoline be covered by that? Pardon me? Could the fumes from gasoline include that definition? Yes, they could. But then for someone to be prosecuted under the statute, the prosecutor would also have to show that that individual intended to use that gas to commit a felony. And that's an important limiting principle on the statute. The defendant also objects that the statute is too broad, and it allows for prosecutorial overreaching. In this court's recent decision, People v. Howard, addresses those concerns. In that case, the court dealt with the interpretation of the official misconduct statute and whether specifically a violation of a duty imposed by the state constitution could serve as the predicate unlawful act. And this court's opinion openly expressed skepticism about the plain meaning of the statute, but nevertheless adhered properly to it, noting that concerns about whether the statute was too broad or was wise or sound policy were appropriate objections to be made to the General Assembly, and also noting that courts don't read in restrictions into the plain language of the statute. So to follow up on Justice Fitzgerald's question, is so somebody that's carrying gasoline with the intention of setting a fire, committing an arson, would be guilty under this statute? Yes. And again, in passing the... What about the man or woman driving on the revoked license? Well, I don't know in that case that the... Intent to commit, assume it's a felony, intent to commit the felony of driving on a suspended or revoked license. Well, the statute also requires proof that the defendant intends the substance to be used in the commission of the felony, so I don't know that that application would fall under the statute. Defense counsel also points out that, or contends that anhydrous ammonia is not that deadly since it's classified as a Class D substance, which means that the gas is considered poisonous at a concentration of 3,000 to 5,000 parts per million, but the testimony in this case was at a concentration of 500 parts per million. Exposure to anhydrous ammonia is going to cause, can cause blindness, can cause burning of the lung linings, and can cause death. And finally, affording the term its plain meaning makes sense in this case, since the statute is not merely designed, it's not a mere possession statute. The General Assembly recognized that individuals intending to commit felonies can make uses for substances that may be innocuous in certain situations, but when put in a larger quantity or put to an illicit purpose, can assist them in the commission of felonies. And that's exactly the case with anhydrous ammonia. If there are no further questions, we'd ask that this Court reverse the appellate court's judgment. Thank you. Thank you, counsel. Case number 106-219 will be taken under advisement as adjourned.